ROBERTS, J., for the Court.
¶ 1. Angela Smith appeals the Monroe County Circuit Court’s judgment to affirm the full Mississippi Worker’s Compensation Commission’s decision that due to her bilateral carpal tunnel syndrome, she had a 5% industrial loss of use to both of her upper extremities. Smith also appeals the circuit court’s judgment to reverse the Commission’s decision that she was entitled to a period of total temporary disability benefits. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. In 1989, Smith began working for Tronox LLC, a chemical manufacturing facility in Hamilton, Mississippi, that produces pigments for paint.[1] Although she worked in various capacities during her employment at Tronox, Smith’s duties primarily involved monitoring gauges and machinery, emptying fifty-pound bags of sand into a machine approximately once every two hours, and turning various valve handles when necessary.
¶ 3. According to Smith, her hands began to hurt sometime during 1999 or 2000.[2] Smith claimed she reported her pain to Tronox, but Tronox’s records do not indicate Smith ever informed any of her employers she had trouble with her hands. As best we can tell, Smith’s treatment for carpal tunnel syndrome originated from Dr. Walter Eckman’s treatment of her back during 2000. Smith’s medical records from Dr. Eekman were not entered into evidence. Be that as it may, the record reflects Dr. Eekman referred Smith to Dr. Laura Gray, a physiatrist[3] in Tupe-lo, Mississippi, for further treatment of Smith’s back problems. Dr. Gray first saw Smith on December 7, 2000.
¶ 4. Dr. Gray’s medical records note that Smith had not been working because of Dr. Eckman’s restrictions, which were related to Smith’s back problems. Dr. Gray’s records indicate Smith initially complained of neck and back pain, problems with her left leg, and problems with her hands. Dr. Gray ordered a nerve-conduction study and eventually diagnosed Smith with bilateral carpal tunnel syndrome.[4] Dr. Gray attempted to treat *777 Smith’s carpal tunnel syndrome conservatively with medication and wrist splints. However, Dr. Gray released Smith to return to work with restrictions of “no repetitive flexion or extension of wrists.” Dr. Gray continued to release Smith to return to work after follow-up appointments in January, March, and April 2001.
¶5. Dr. Gray’s treatments were interrupted when Smith had surgery to repair an unruptured brain aneurysm in May 2001. In August 2001, Smith returned to Dr. Gray for further treatment. Approximately one month later, Smith filed her petition to controvert. Smith claimed she was entitled to workers’ compensation benefits for her bilateral carpal tunnel syndrome. Within her petition to controvert, Smith stated her bilateral carpal tunnel syndrome was caused by “repetitive motion of opening large valves and pulling rusty ... levers” that were hard to move.
¶ 6. Despite Dr. Gray’s treatments, Smith said she did not receive significant relief. As a result, Dr. Gray referred Smith to Dr. Robert Buckley, an orthopedic surgeon. Dr. Buckley never testified, and his medical records were not entered into evidence. Smith testified Dr. Buckley performed carpal tunnel release surgery on Smith’s right arm during April 2002. According to Smith, the surgery did not significantly relieve her symptoms. Consequently, Smith declined to have carpal tunnel release surgery on her left arm. Smith returned to Dr. Gray for further treatment.
¶ 7. In January 2004, Dr. Johnny Mitias of New Albany Orthopaedics performed an independent evaluation of Smith. Tronox later deposed Dr. Mitias, who testified that, in his opinion, Smith’s carpal tunnel syndrome was not related to her duties at Tronox. In fact, Dr. Mitias testified Smith’s problems were more likely related to other problems she was having. Dr. Mitias noted that if Smith’s symptoms were work related, Smith would have experienced some relief because she had not been working for approximately three years, but Smith reported she was still in pain. Dr. Mitias also testified: “[I]f it was just purely a mechanical carpal tunnel syndrome ... it would have been relieved. Once you remove the mechanical problem, which is pressure on the nerve, it should go away.”
¶8. Dr. Mitias further testified that opening and closing valves is “generally not a carpal tunnel producer. That’s a rotational problem more than high-speed assembly.” Furthermore, Dr. Mitias found it “striking” that Smith declined to have a carpal tunnel release on her left arm. Dr. Mitias also noted, during his independent examination, Smith failed the “five-position grip-strength test,” which was “an indication of submaximal effort,” meaning Smith did not try as hard as she could. Dr. Mitias testified that the five-position grip-strength test “is a pretty accurate measure of how much effort somebody’s putting into something.” Dr. Miti-as further testified Smith’s failure of the grip-strength test was “really a lot of concern to [him].” Dr. Mitias summarized his opinion by reiterating that it was based on (1) Smith’s explanation of her work duties; (2) the fact Smith did not experience relief after she stopped working; (3) the fact Smith did not experience relief after the carpal tunnel release; and (4) Smith’s other medical issues with her neck, back, and her brain aneurysm “which can lead to all sorts of sensations.”
¶ 9. On August 16, 2004, Tronox deposed Dr. Rhea, who had initially treated Smith for numbness and occasional pain in her hands during 1995. Dr. Rhea noted that Smith’s duties at work did not require any forcible or repetitive hand-intensive activities. Dr. Rhea testified that, in his opin *778 ion, it was possible Smith’s symptoms originated from her neck problems. Additionally, Dr. Rhea explained that patients generally have more than a 95% chance of improving after carpal tunnel release surgery “if truly the disease is median nerve compression neuropathy at the wrist and there are no other factors.”
¶ 10. On June 7, 2007, the parties went before the administrative judge (AJ). The depositions of Dr. Gray, Dr. Mitias, and Dr. Rhea were submitted into evidence. Smith testified and then rested. Tronox then called Patsy Shannon, Tronox’s occupational health nurse. Additionally, Tro-nox called Michael Goldman, Tronox’s staff-safety specialist.
¶ 11. Ultimately, the AJ found Smith had sustained a work-related injury. The AJ then concluded Smith had a 5% industrial loss of use regarding both of her arms. Accordingly, the AJ ordered Tro-nox to pay Smith permanent partial disability benefits of $303.35 per week for ten weeks for one arm and ten additional weeks for her other arm. Furthermore, the AJ found Smith was not entitled to temporary benefits because she would only be entitled to temporary benefits “for the time she had surgery,” and Smith failed to enter Dr. Buckley’s medical records into evidence. Smith appealed the AJ’s decision to the full Commission.
¶ 12. The Commission agreed with the AJ’s decision regarding permanent partial disability benefits. However, the Commission’s order indicates Smith should receive permanent partial disability benefits for ten weeks instead of twenty weeks. Additionally, the Commission disagreed with the AJ’s conclusion regarding temporary benefits. The Commission ordered Tro-nox to pay Smith temporary disability benefits from April 5, 2002, until October 27, 2003 — which was the date that the parties stipulated as the date Smith had reached maximum medical improvement. Tronox appealed the Commission’s decision to the circuit court, and Smith cross-appealed.
¶ 13. The circuit court affirmed the Commission’s decision regarding permanent partial disability benefits. As for temporary disability benefits, the circuit court found the Commission’s decision was not supported by substantial evidence. Consequently, the circuit court reversed that portion of the Commission’s decision. Aggrieved, Smith appeals.
STANDARD OF REVIEW
¶ 14. The standard of review regarding an appeal of a workers’ compensations case is well settled:
The Mississippi Workers’ Compensation Commission is the ultimate fact-finder. Accordingly, the Commission may accept or reject an [AJ’s] findings. This Court will affirm the Commission’s findings of fact if they are supported by substantial evidence. In other words, this Court will reverse an order of the Workers’ Compensation Commission only where such order is clearly erroneous and contrary to the overwhelming weight of the evidence. Doubtful claims should be resolved in favor of compensation, so as to fulfill the beneficial purposes of statutory law. Unless common knowledge suffices, medical evidence must prove not only the existence of a disability but also its causal connection to the employment. As with any fact-finder, the Commission is entitled to rely upon the evidence and reasonable inferences.
Smith v. Masonite Corp., 48 So.3d 565, 570 (¶ 19) (Miss.Ct.App.2010) (quoting Frito-Lay, Inc. v. Leatherwood, 908 So.2d 175, 179-80 (¶¶ 20-21) (Miss.Ct.App.2005)).
*779 ANALYSIS
I. PERMANENT PARTIAL DISABILITY
¶ 15. Smith claims the Commission erred when it concluded she had a five percent disability to both arms. According to Smith, because her carpal tunnel syndrome prevented her from returning to her previous position, the Commission should have awarded her benefits for the total loss of use of both of her arms. We disagree.
¶ 16. “In a workers’ compensation case, the claimant bears the burden of proving by a fair preponderance of the evidence each element of the claim. These elements are: (1) an accidental injury, (2) arising out of and in the course of employment, and (3) a causal connection between the injury and the death or claimed disability.” Smith, 48 So.3d at 671(¶21) (quoting Hardin’s Bakeries v. Dependent of Harrell, 566 So.2d 1261, 1264 (Miss. 1990)). Disability means “incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss.Code Ann. § 71-3-3(0 (Rev.2011).
¶ 17. Smith’s argument appears to be based on the principle that an employee who suffers an injury to a scheduled member resulting in permanent partial disability is entitled to “the greater amount of compensation determined under two alternate theories of computation.” Hollingsworth v. I.C. Isaacs and Co., 725 So.2d 251, 254 (¶ 10) (Miss.Ct.App.1998). The first theory of computation involves determining the functional disability of a scheduled member. Id. Once the functional disability of a scheduled member has been determined, compensation is calculated by multiplying the percentage of functional disability by the maximum number of weeks for the scheduled member. Id. Finally, the result of that calculation is then multiplied by 66 2/3% of the employee’s average weekly wage. Id. (citation omitted). That is how the Commission calculated Smith’s compensation.
¶ 18. The second alternate theory of computation involves determining the employee’s industrial disability. Id. An employee’s industrial disability is based not only on the medical evidence, but also upon the evidence demonstrating how the employee’s limited functioning member affects the employee’s ability to perform the duties normally associated with his or her job. Id. As previously mentioned, Smith argues that her carpal tunnel syndrome requires she receive benefits for the total loss of use of both of her arms.
¶ 19. To support her position, Smith draws our attention to her testimony that she could not return to work. Smith claims Shannon corroborated her testimony that she could not return to work. However, that is not an entirely accurate characterization of Shannon’s testimony. Shannon testified that, in her opinion, Tro-nox would attempt to accommodate any restrictions Smith had. Shannon also testified that “more than likely they would have been able to [accommodate Smith] on a short-term basis.” According to Shannon, Smith’s circumstances were complicated by the fact that Tronox had been accommodating Smith’s back problems. Shannon also testified that Smith’s position at Tronox did not involve repetitive hand movements.
¶ 20. Smith notes the Commission limited her industrial loss of use to 5% because: (1) Smith had been off work for unrelated medical conditions; (2) Smith had worked some as a substitute bus driver after she stopped working at Tronox; and (3) Smith had not sought permanent employment af *780 ter she had stopped working at Tronox. According to Smith, none of these things— alone or in conjunction with one another— operate to limit her to a 5% industrial loss of use of her arms.
¶21. The Mississippi Supreme Court has held:
If the injury prevents the employee from resuming his former trade, work[,] or employment, this alone is not the test of disability to earn wages or the test of the degree of such disability, but the definition relates to loss of capacity in “the same or other employment,” and the meaning is that the employee, after his period of temporary total incapacity, must seek employment in another or different trade to earn his wages.
Sardis Luggage Co. v. Wilson, 374 So.2d 826, 828 (Miss.1979) (quoting V. Dunn, Mississippi Workmen’s Compensation § 72 (2d ed. 1967)). “To demonstrate total disability, the claimant must show that [she] has made a diligent effort, but without success, to obtain other gainful employment.” Adolphe Lafont USA v. Ayers, 958 So.2d 883, 839 (¶18) (Miss.Ct.App.2007) (citation omitted). Smith never attempted to return to work at Tronox. As a result, Tronox never had an opportunity to accommodate Smith.
¶22. Smith also argues there is no evidence that her minor cognitive difficulties associated with a repaired unruptured brain aneurysm prevent her from returning to work. Smith does not discuss her back and neck problems, nor does she discuss how they factor into whether she can return to work. In any event, Smith contends that her acceptance of part-time work as a school bus driver demonstrates she is willing to work. According to Smith, it also demonstrates that her other medical problems were not disabling. Even so, if her work as a school bus driver demonstrates her other medical problems were not disabling, it also demonstrates her carpal tunnel syndrome was not completely disabling. Additionally, Smith argues that her part-time work demonstrates the difficulty that she had finding work. But Smith specifically stated she did not look for other work.
¶ 23. The Commission “serves as the ultimate fact finder in addressing conflicts in medical testimony and opinion.” Raytheon Aerospace Support Servs. v. Miller, 861 So.2d 330, 336 (¶ 13) (Miss. 2003). “Where medical expert testimony is concerned, [the supreme court] has held that whenever the expert evidence is conflicting, the Court will affirm the Commission's decision] whether the award is for or against the claimant.” Id. (quoting Kersh v. Greenville Sheet Metal Works, 192 So.2d 266, 268 (Miss.1966)). Even if this Court would not have reached the same decision as the Commission, we must affirm when the Commission’s findings are supported by substantial evidence and are neither arbitrary nor capricious. Id. at 338 (¶ 25).
¶ 24. It is well settled that workers’ compensation claimants have “the burden of proving disability and the extent thereof.” Lifestyle Furnishings v. Tollison, 985 So.2d 352, 359 (¶ 21) (Miss.Ct. App.2008) (citation omitted). “The issue of whether a claimant’s permanent disability is partial or total is a fact question to be determined from the evidence as a whole, including both medical and lay testimony.” Smith, 909 So.2d at 1222 (¶ 47) (citing McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 167 (Miss.1991)). Smith presented evidence that according to Dr. Gray, Smith had a 3% impairment rating to each arm. Dr. Gray never testified Smith could not return to work because of her carpal tunnel syndrome. Dr. Gray also declined to testify that Smith’s restric *781 tions of limited repetitive hand movement and lifting of no more than ten pounds were permanent. Dr. Mitias testified that, in his opinion, Smith’s symptoms were not related to carpal tunnel syndrome. Dr. Rhea agreed. Goldman testified that Smith’s former position at Tronox did not require rapidly repetitive hand movement. Smith declined Dr. Gray’s offer to refer her to vocational rehabilitation. In light of our standard of review, we do not find the Commission erred when it assigned Smith a 5% impairment to each arm and awarded permanent partial disability benefits. Accordingly, we affirm the circuit court’s judgment, which affirmed the Commission’s decision.
II. TEMPORARY TOTAL DISABILITY
¶25. As previously mentioned, the Commission awarded Smith temporary total disability benefits from the date of Smith’s carpal tunnel release surgery to the stipulated date of Smith’s maximum medical improvement. Smith appeals the circuit court’s reversal of the Commission’s decision. According to Smith, because the Commission:
has seen hundreds, if not thousands of bi-lateral carpal tunnel claims ... [and it is common in such claims] that the [c]laimant usually sustains a period of temporary total disability after he or she has had surgery for this condition ... the Commission could easily base its finding on common knowledge, common experience, and common sense.
Smith, therefore, contends she was entitled to temporary total disability benefits.
¶26. As Tronox notes, there was no evidence presented that Smith was taken off work by any physician. Smith failed to submit Dr. Buckley’s medical records or testimony into evidence. As Tronox notes, without Dr. Buckley’s medical records or testimony “we [do not] know whether he would have taken [Smith] off work for one day or one week, much less almost [nineteen] months.” Smith cites no authority that a claimant is entitled to temporary disability benefits for the entire period between the date of surgery and the date of maximum medical improvement. Additionally, Smith cites no authority that the date of maximum medical improvement is the equivalent of the first date one may return to work after sustaining an injury. Because Smith failed to sustain her burden of proof, we find no error with the circuit court’s judgment to reverse the Commission’s decision. Accordingly, we find no merit to this issue.
¶ 27. THE JUDGMENT OF THE MONROE COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR. MYERS, J., NOT PARTICIPATING.

. The company was known as Kerr-McGee Chemical, LLC when Smith was working there. Since that time, Kerr-McGee has been acquired by Tronox.

. However, the record contains evidence that Dr. Charles Rhea diagnosed Smith with bilateral carpal tunnel syndrome in 1995. Because Smith's work did not involve any hand-intensive activities, Dr. Rhea ordered conservative treatment of Smith. Smith stopped going to her appointments with Dr. Rhea after two office visits.

. A physiatrist is a physician who specializes in physical medicine and rehabilitation.

. Dr. Gray later testified during her deposition that she was unaware of Dr. Rhea’s previous diagnosis.